Janice G. **CLARK**, et al.

v.

Edwin W. **EDWARDS**,* et al.

**Civ. A. No. 86–435–A.**

M.D. Louisiana.

Aug. 15, 1988.

Opinion on Motions to Amend and for Stay, Aug. 31, 1988.

---

* Charles "Buddy" Roemer has succeeded Edwin W. Edwards as Governor of Louisiana and has    been substituted as defendant.

Ernest L. Johnson, T. Richardson Bobb, Baton Rouge, La., Robert McDuff, Lawyer's Committee for Civ. Rights Under Law, Washington, D.C., Ulysses Thibodeaux, Newman & Thibodeaux, Lake Charles, La., for plaintiffs.

Kenneth C. DeJean, Roy Mongrue, Staff Atty., Louisiana Dept. of Justice, Michael H. Rubin, Christine Peck, Rubin, Curry, Colvin & Joseph, Baton Rouge, La., Fred J. Cassibry, Jan T. Van Loon, Sandra A. Vujnovich, Brook, Morial, Cassibry, New Orleans, La., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN V. PARKER, Chief Judge.

This is a class action brought by black voters and black lawyers who possess the qualifications to be elected Louisiana district court, family court, and court of appeal judges. Plaintiffs claim that use of multimember districts to elect family court, district court and court of appeal judges operates to dilute black voting strength in violation of the Fourteenth and Fifteenth Amendments and Section 2 et seq. of the Voting Rights Act of 1965.

The original plaintiffs are Janice G. Clark and three other black lawyers who live in East Baton Rouge Parish, each of whom is a qualified voter and each of whom meets the statutory requirements for the office of judge, and Voter Information Project, Inc., a non-profit corporation, which promotes the right of black and poor people to participate in the electoral process. Subsequently, additional black lawyers from other parts of the state were allowed to become parties-plaintiff and the New Orleans Chapter of the Louis A. Martinet Society was permitted to intervene as a plaintiff. The defendants are the Governor of Louisiana, the Secretary of State, the Attorney General, all in their official capacities, and various other state and local election officials. The Louisiana District Judges Association and the Orleans Trial Judges Association were permitted to intervene as defendants.

The case has been tried on the merits and the court has issued a preliminary injunction, enjoining the holding of elections for certain judicial offices which were scheduled for October 1988. This will constitute the court's findings of fact and conclusions of law on both the motion for preliminary injunction and the merits.

THE STIPULATIONS

The parties have entered written stipulations containing 103 paragraphs, to which the defendants make 66 objections, all upon the ground of relevancy. The information objected to generally relates to 1980 census information including, population, race and socio-economic facts, specific information about the number of black judges in Louisiana and how they attained their positions, black elections generally and other miscellaneous information. The court overrules all objections. The information, some of which is only marginally helpful, is admittedly true and generally well known. Attached to the written stipulations identified as "Attachment A" is a list which the parties stipulate accurately describes the number of judges in each district court judicial district, the parishes which comprise the district, the total population, total black population and black percentage of population (according to the 1980 census) in each parish and district court district. They also attach "Attachment B" and stipulate that it accurately describes the number of judges for each court of appeal circuit and district in a fashion similar to the district court stipulation. A copy of each attachment, Attachment A and Attachment B, is attached to and made a part of this opinion.

The other stipulations are:

3. In all district court districts which contain more than one judge, the judges

are elected through at-large voting from the entire district.

4. There are five circuit courts of appeals in Louisiana. Each of the five is divided into separate election districts, as reflected in Attachment B. In those districts which contain more than one judge, the judges are elected through at-large voting from the entire district. In addition, as reflected in Attachment B, some of the circuits have judges who are elected at-large from the entire circuit.

5. The family court in East Baton Rouge Parish is composed of three judges, who are elected at-large from the entire parish. East Baton Rouge Parish has a total population, according to the 1980 census, of 366,191, a black population of 114,-741, and a black percentage of population equaling 31.3%.

6. In Louisiana, candidates running for district court, appellate court, and family court judge must win a majority of the vote in order to be elected to office.

6A. In Louisiana, candidates running for district court, appellate court, and family court judge must be attorneys, must have been admitted to the practice of law in Louisiana for at least five years prior to the election, must have been domiciled in the respective district, or parish for the two years preceding the election, and shall not practice during the term of office. La. Const. Art. 5, Section 24.

7. In Louisiana, candidates running for district court and appellate court judgeships from multimember districts, and for family court judgeships in East Baton Rouge Parish, must run from a designated division or post within the district.

8. For those district court and family court judgeships which are elected from multimember districts in the state of Louisiana, the judge must be a resident of the district, but there is no further residency requirement mandating that the candidate reside in a particular geographic portion of the district. For those Court of Appeal judgeships which are elected from multimember districts in the State of Louisiana, the judge must be a resident of the circuit and the respective district, but there is no further residency requirement mandating that the candidate reside in a particular geographic portion of the district.

9. Outside of Orleans Parish, there are 156 district court judgeships in Louisiana.

10. Outside of Orleans Parish, there are two black judges (and no more than two) who have been elected to, and who will be serving in, district court judgeships as of June, 1988.

11. Outside of Orleans Parish, the black judges who have been elected to, and who will be serving as, district court judges as of June, 1988 are Carl Stewart in District 1 (composed of Caddo Parish), and Freddie Pitcher in District 19 (composed of East Baton Rouge Parish).

12. In Orleans Parish, the criminal district court is composed of 10 judges and the civil district court is composed of 12 judges. All of the judges on the criminal and civil district courts in Orleans Parish are elected at-large from the entire parish.

13. In Orleans Parish, no black attorneys are currently serving as judges on the criminal district court. Israel Augustine is a black attorney who was appointed to the Orleans Parish criminal district court in 1969 to a vacancy. He ran for election in 1970 to his seat on the criminal district court. In the Democratic primary of that election, he defeated two white candidates. He was unopposed in the general election. He is the only black attorney of whom the parties are aware (excluding ad hoc appointments) who has served on the Orleans Parish criminal district court in the twentieth century.

14. In Orleans Parish, three black attorneys currently serve as judges on the civil district court. They are the only three black attorneys of whom the parties are aware who have been elected to the Orleans Parish civil district court in the twentieth century. They are Revius Ortique, Jr., Bernette Johnson, and Yada McGee.

15. Currently, there are 48 Court of Appeal judgeships in the State of Louisiana.

16. There is one (and no more than one) black attorney currently serving as a Court

of Appeal judge in the State of Louisiana, and that is Judge Joan Armstrong, who was elected in 1984 from District 1 of the Fourth Circuit. District 1 of the Fourth Circuit is composed of Orleans Parish.

17. If each of the existing multimember judicial districts were subdivided into single-member subdistricts—with the number of single-member subdistricts equalling the number of judges in the original district, and with the subdistricts being of roughly equal population when compared to the other subdistricts within the original district— the black population in the following multimember districts is sufficiently large and geographically compact to constitute a majority in at least one of the single-member subdistricts;

The Family Court of East Baton Rouge Parish;

District court districts: 1, 4, 6, 9, 14, 15, 18, 19, 23, 24, 27, 40;

The Orleans Parish Civil District Court;

The Orleans Parish Criminal District Court;

Court of Appeal districts: First Circuit district 2, Fourth Circuit district 1.

In addition, using no more than a 5% plus or 5% minus deviation from the ideal subdistrict size within any given district, it is impossible to create single-member subdistricts equalling the number of judges in the original district and still obtain at least one majority black single-member subdistrict in the following districts:

District court districts: 5, 12, 13, 17, 22, 25, 30, 32, and 34.

Court of Appeal districts: First Circuit, district 1; Second Circuit, district 2 (two judges); Third Circuit, district 1 (two judges); Third Circuit, district 2 (two judges); Third Circuit, district 3 (two judges).

(The absence of a stipulation regarding the remaining districts is not meant to suggest anything one way or the other about those districts. They may be the subject of proof at trial. In addition, the parties are entering into no stipulation regarding the issue of whether the hypothetical judicial subdistricts must fall within a 5% plus or 5% minus deviation from the ideal subdistrict size in a given district).

18. The following district court districts contain only one judge; 8, 28, 31, 33, 35, 36, 37, 38, and 39.

19. Of the 48 Court of Appeal judgeships in the State of Louisiana, 44 are elected from multimember districts.

20. Of the 178 district court judgeships in the State of Louisiana, 169 are elected from multimember districts.

21. In the State of Louisiana, justices of the peace are elected from single-member districts.

21A. In the State of Louisiana, justices of the peace are not required to be lawyers, are not required to have practiced law or have been engaged in any legal-related work, and are elected at the congressional election for terms of six years by the qualified voters within the territorial limits of their jurisdiction, according to R.S. 13: 2582, as amended by Acts 1984, No. 219, Section 1.

22. The Louisiana Supreme Court is composed of seven elected justices. For purposes of their election, the state is divided into six districts. The First Supreme Court district is composed of Orleans, St. Bernard, Plaquemines, and Jefferson Parishes, and elects two justices at-large from those four Parishes. The remainder of the state is divided into five single-member districts, each of which elects one justice.

23. While none of the justices on the Louisiana Supreme Court is elected statewide, the Supreme Court has statewide jurisdiction. The Supreme Court sits as a body of the whole, and four of its seven members must concur to render judgment. Pursuant to Article 5, section 2 of the Louisiana Constitution, a single justice of the Supreme Court may issue writs of habeas corpus and all needful writs, orders, and process in aid of the jurisdiction of the Court, and exercise of this authority is subject to review by the whole court.

24. Since 1965, the State of Louisiana has been covered by the suspension of tests provision (section 4) and the federal preclearance of voting law changes provision

(section 5) of the Voting Rights Act of 1965.

25. Pursuant to Section 6 of the Voting Rights Act of 1965, 42 U.S.C. section 1973d, the United States Department of Justice has designated various Louisiana parishes for the appointment of federal examiners (registrars).

26. Pursuant to Section 8 of the Voting Rights Act of 1965, the United States Department of Justice has sent federal observers to observe elections in the State of Louisiana.

27. In the twentieth century, no black citizen has been elected to statewide office in the State of Louisiana.

28. In the twentieth century, no black citizen has been elected to the United States Congress from the State of Louisiana.

29. In the twentieth century, no black attorney has been elected to the Louisiana Supreme Court. A black attorney, Jessie Stone, was appointed to a vacancy on the Louisiana Supreme Court for a period of 17 days, from November 2, 1979 through November 19, 1979.

30. All of the current officers of the Louisiana Bar Association are white.

31. None of the present black members of the Louisiana legislature was elected from a district which was majority white in population.

32. None of the elected district attorneys in the State of Louisiana are black.

33. In the twentieth century, none of the elected district attorneys in the State of Louisiana have been black.

34. Candidates for judicial posts in the State of Louisiana do not run from parish primaries. Instead, all candidates run in a single non-partisan primary. The two top candidates in the primary then compete in a general election, with the candidate receiving the majority of the vote being declared the winner.

35. District court judges in the State of Louisiana serve six-year terms, and appellate court judges serve ten year terms.

36. The most recent regular election for district judges in Louisiana was held in 1984, and the next regular election will be in 1990.

37. According to 1980 Census figures, the median family income in the State of Louisiana was $20,867 for whites and $10,459 for blacks. The median income of black families was therefore 50.12 percent of that of white families.

38. According to 1980 Census figures, 18.93 percent of white families in Louisiana had incomes less than $10,000; 43.20 percent had incomes between $10,000 and $24,999; and 37.87 percent had incomes of $25,000 or more. By contrast, 48.25 percent of black families in Louisiana had incomes less than $10,000; 37.25 percent had incomes between $10,000 and $24,999; and 14.49 percent had incomes of $25,000 or more.

39. According to 1980 Census figures, the median income for unrelated individuals in the State of Louisiana was $6,709 for whites and $3,203 for blacks. The median income of black unrelated individuals was therefore 47.74 percent of that of whites.

40. According to 1980 Census figures, 295,873 whites in the State of Louisiana had incomes which fell below the poverty level; 456,909 blacks had poverty-level incomes. The total number of persons in Louisiana with incomes below the poverty level was 762,108. Blacks therefore comprised 59.95 percent of all persons below poverty level in Louisiana; whites comprised 38.82 percent of persons below poverty level. 10.4 percent of white persons in the State of Louisiana had incomes which fell below poverty; this was true for 38.0 percent of blacks in the state.

41. According to 1980 Census figures, the median years of school completed for persons 25 years of age and older in the State of Louisiana was 12.4 for whites and 10.7 for blacks. 5.2 percent of white persons 25 years of age and over in the state had less than 5 years of elementary education; 15.1 percent of black persons 25 and over had less and 5 years of schooling. 63.7 percent of white persons in Louisiana 25 and over were high school graduates;

40.5 percent of blacks in this age group had graduated from high school. 16.10 percent of whites 25 and over had four or more years of college; 7.5 percent of blacks had four or more years of college.

42. According to 1980 Census figures, 2.6 percent of white persons in the State of Louisiana 16 years and over were unemployed, while 5.7 percent of blacks 16 and over were unemployed.

43. According to 1980 Census figures, of 340,396 persons 16 years and older employed in managerial and professional specialty occupations in the State of Louisiana, 288,640 (84.66 percent) were white and 48,544 (14.24 percent) were black. Of 479,054 persons employed in technical, sales, and administrative support occupations, 399,897 (83.48 percent) were white and 74,648 (15.58 percent) were black. Of 218,816 persons in Louisiana employed in service occupations, 110,579 (50.54 percent) were white and 105,361 (48.15 percent) were black.

44. According to 1980 Census figures, there were 1,030,950 occupied housing units in the State of Louisiana with a white householder; there were 365,643 occupied housing units in Louisiana with a black householder. 70.96 percent of occupied housing units with a white householder were owner-occupied; 51.01 percent of units with a black householder were owner-occupied. [Tables 13 and 14, Detailed Housing Characteristics, Louisiana].

45. Louisiana was once a state where slavery was sanctioned by law, and vestiges of discrimination persisted for some time which affected the rights of black persons to register to vote or otherwise to participate in the democratic process.

46. In the twentieth century, no black person was elected to the Louisiana legislature until 1967.

47. The first black person elected to the Louisiana legislature in the twentieth century was Ernest N. Morial, elected to the state house of representatives in 1967.

48. No black citizen was elected to the Louisiana Senate in the twentieth century until 1974.

49. According to 1980 census figures, the total population of the state of Louisiana is 4,205,900, and the black population is 1,238,241, or approximately 29.4% of the total.

50. According to 1980 census figures, the voting age population of the state of Louisiana is 2,875,432, and the black voting age population is 766,187, or approximately 26.6% of the overall voting age population.

51. Outside of Orleans Parish, four black attorneys (and no more than four) have been elected to district court judgeships in the twentieth century in the State of Louisiana.

52. The four black attorneys of whom the parties are aware who have been elected to district court judgeships in the twentieth century in the State of Louisiana, outside of Orleans Parish, are Paul Lynch, elected in District 1 in 1978, Lionel Collins, elected in District 24 in 1978, Carl Stewart, elected in District 1 in 1985 and Freddie Pitcher, elected in District 19 in 1986.

53. Judge Lionel Collins was first elected to the district court in District 24 in 1978, and re-elected as an incumbent in 1984. He died in April, 1988, while still in office.

54. In the 1978 election, when he was first elected to office as a district judge in District 24, Lionel Collins had no opposition.

55. Prior to his election to the district court bench in 1978, Lionel Collins was appointed to a vacancy on the district court in District 24.

56. In the 1984 election, when he was re-elected as an incumbent to office as a district judge in District 24, Lionel Collins had no opposition.

57. Paul Lynch ran for district judge in District 1 in the 1974 election and was defeated by a white opponent.

58. Judge Paul Lynch died in 1982 before the completion of his term as a district court judge in District 1.

59. Carl Stewart was first elected district court judge in District 1 in 1985.

60. The parties are not aware of any black attorney who has been elected to a Court of Appeal judgeship in the twentieth century, in the State of Louisiana outside of Orleans Parish.

61. No black judge currently serves as an officer or member of the executive committee of the Louisiana District Judges Association.

62. Prior to his death in 1982, Judge Paul Lynch, a black attorney, served on the executive committee of the Louisiana District Judges Association.

63. No black judge has ever served as one of the officers ("officers" meaning president, 1st vice president, 2nd vice president, secretary, and treasurer) of the Louisiana District Judges Association.

64. At the present time, approximately 2% of the enrollment of the Louisiana State University Law School is constituted by black students.

65. The law school at Southern University first opened in 1947.

66. The first class to graduate from the Southern University Law School was in 1950.

67. At its inception, the law school at Southern University was completely black in terms of student enrollment. At the present time, the student body includes both black and white students.

68. At the inception of the Southern University School of Law, some of the courses were taught by members of the faculty of the LSU Law School.

69. As far as the parties are aware, in the twentieth century, no law school in Louisiana accepted any black students until the opening of Southern University Law School in 1947.

70. Currently, there are 32 full-time faculty members at the Louisiana State University Law School, and two of those are black. Currently, there are 15 full-time faculty members at the Southern University Law School. Of those, nine are black, five are white, and one is from India.

71. As far as the parties are aware, in the twentieth century, only three black persons have served as full-time permanent faculty members (excluding visiting faculty members) at the Louisiana State University Law School.

72. The only public law schools operating in the State of Louisiana after 1940 are the Louisiana State University Law School and the Southern University Law School. Private law schools operating in Louisiana after 1940 include the Tulane Law School and the Loyola Law School.

73. The first black graduate of Louisiana State University Law School, Ernest Morial, was admitted to the law school after a three-judge federal court in the class action case of *Wilson v. Board of Supervisors of Louisiana State University*, 92 F.Supp. 986 (E.D.La.1950) (three-judge court), summarily aff'd 340 U.S. 909, 71 S.Ct. 294, 95 L.Ed. 657 (1951), ordered the Board of Supervisors of Louisiana State University to stop denying law school admission to black students on the basis of race.

74. As far as the parties are aware, the black judges who have been elected to district court or the court of appeal in Orleans Parish in the twentieth century are: Israel Augustine (Court of Appeal); Ernest Morial (Court of Appeal); Joan Armstrong (Court of Appeal); Revius Ortique, Jr. (civil district court); Bernette Johnson (civil district court); Yada McGee (civil district court).

75. Israel Augustine was appointed in 1969 to a vacancy for the criminal district court in Orleans Parish.

76. At the time Israel Augustine was elected to the Court of Appeal, he was a sitting criminal district court judge, having first been appointed to a vacancy on the criminal district court in 1969 and having been elected to the position on the criminal district court in 1970.

77. When Israel Augustine was elected to the Court of Appeal, he had no opposition.

78. At the time Ernest Morial was elected to the Court of Appeal, he was a sitting Juvenile Court judge.

79. Ernest Morial had achieved his position as a juvenile court judge by virtue of appointment.

80. Subsequent to his appointment to the juvenile court, Ernest Morial ran for election as an incumbent for his juvenile court seat, and had no opposition.

81. As far as the parties are aware, there has never been more than one black Court of Appeal judge at any single time in the twentieth century in Louisiana.

82. As far as the parties are aware, Ernest Morial was the first black attorney to be elected to the Court of Appeal in the state of Louisiana in the twentieth century, and his election was in 1972.

83. Revius Ortique first came to the civil district court bench by virtue of appointment to a vacancy in 1978.

84. Revius Ortique was first elected to the civil district court bench in 1979, when he was running as an incumbent by virtue of his previous appointment to the position.

85. At his first election to the civil district court in 1979, Revius Ortique had opposition, but in his second election in 1984, he had no opposition.

86. Bernette Johnson was first elected to the civil district court in 1984.

87. Joan Armstrong was elected to the Court of Appeal in 1984.

88. Israel Augustine retired from his seat on the Court of Appeal in 1984.

89. At the time Joan Armstrong ran for the Court of Appeal in 1984, she was a sitting juvenile court judge.

90. Joan Armstrong had been appointed to the Juvenile Court judgeship, Section A, after Ernest Morial vacated that seat to go on the Court of Appeal.

91. When Joan Armstrong ran for the Court of Appeal, she had no opposition in the election.

92. Yada McGee was first elected to the civil district court in 1986.

93. All black attorneys who have been elected to the Court of Appeal in Louisiana in the twentieth century were elected in Orleans Parish.

94. According to 1980 Census figures, the median value of owner-occupied housing units with a white householder was $47,800 and with a black householder it was $25,500. [Tables 8 and 9, General Housing Characteristics, Louisiana].

95. According to 1980 Census figures, .44 percent of owner-occupied housing units with a white householder in Louisiana lacked complete plumbing for exclusive use, whereas 2.38 percent of owner-occupied housing units with a black householder lacked such facilities. Among all occupied housing units with a white householder, 1.14 percent lacked a complete bathroom; among those with a black householder, 7.54 lacked complete bathroom facilities. [Tables 8 and 9, General Housing Characteristics, Louisiana; Tables 63 and 64, Detailed Housing Characteristics, Louisiana].

96. According to 1980 Census figures, 7.56 percent of occupied housing units with a white householder in Louisiana lacked a telephone while 19.96 of occupied housing units with a black householder lacked a phone. [Tables 63 and 64, Detailed Housing Characteristics, Louisiana].

97. According to 1980 Census figures, 7.68 percent of occupied housing units with a white householder had no vehicle available; 31.28 percent of black occupied housing units were without vehicles. [Tables 63 and 64, Detailed Housing Characteristics, Louisiana].

98. According to 1980 Census figures, 3.40 percent of owner-occupied housing units with a white householder had more than one person per room; 12.82 percent of owner-occupied black households had more than one person per room. 3.86 percent of all occupied housing units (renter and owner-occupied) with a white householder had more than one person per room; 15.66 percent of all black occupied housing units had more than one person per room. [Tables 13 and 14, General Housing Characteristics, Louisiana].

99. According to 1980 Census figures, the median contract rent for occupied housing units with a white householder was $197, and for black occupied housing units the median contract rent was $99. [Tables

8 and 9, General Housing Characteristics, Louisiana].

The parties have also stipulated as to the land areas for each district court district and each court of appeal circuit and district (that information will not be reproduced here), that a number of statutes relating to state court judges were enforced by the state prior to receiving Section 5 "preclearance" and that the parties are not aware of the state having any written affirmative action hiring program affecting personnel hired by the state's district courts.

## THE APPLICABLE LAW

Because the court finds violations of Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, et seq., there is no need to address the constitutional violations alleged.

Section 2 of the Voting Rights Act requires us to consider the "totality of circumstances":

> A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, *That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.* (underlining added).

The Senate Report which accompanied the 1982 amendment spelled out factors which typically may be relevant to a Section 2 claim. As *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), points out, the enumerated factors are neither comprehensive nor exclusive. 106 S.Ct. at 2759–60. Moreover, plaintiffs must prove a violation: Electorial devices, such as at-large or multimember elections may not be considered per se violations. When the attack is upon multimember districts *Thornburg v. Gingles* holds that plaintiffs must prove as preconditions: First, that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district, if single-member districts were created; second, that the minority group is politically cohesive; and third, that the white majority votes sufficiently as a bloc to enable it, in the absence of special circumstances, usually to defeat the minority's preferred candidate. 106 S.Ct. at 2766.

Although the Court of Appeals squarely held in *Chisom v. Edwards*, 839 F.2d 1056 (5th Cir.1988), that elections for judicial office are subject to Section 2, it cannot be gainsaid that judicial elections are different from other, particularly legislative, elections. Judicial districts are created, not by reason of population, but for the purpose of the administration of justice in a particular jurisdiction. Judgeships are added, not because of population, but because of caseload. The boundaries of district courts are jurisdictional, not related to population. Judges are charged, not with making legislative or social policy, but with the duty of deciding individual cases according to the law, *even when it is unpopular to do so.*

Hence, it has been recognized that the "one man-one vote" principle of legislative apportionment does not apply to judicial elections. *Wells v. Edwards*, 347 F.Supp. 453 (M.D.La.1972), aff'd, 409 U.S. 1095, 93 S.Ct. 904, 34 L.Ed.2d 679 (1973); see also *Voter Information Project v. City of Baton Rouge*, 612 F.2d 208 (5th Cir.1980).

The Supreme Court in *Thornburg v. Gingles*, was considering a redistricting plan for the North Carolina General Assembly, not judicial elections, when it noted that "the inquiry into the existence of vote dilution caused by submergence in a multimember district is district-specific." 106 S.Ct. at 2771, n. 28. Both sides in this case have presented evidence regarding specific district court and court of appeal districts and plaintiffs have several times attempted

to limit the case to a specific number of designated districts in which they claim Section 2 violations can be proved. Each time the court has declined to permit the limitation because of the court's conviction that the case involves the election *system*, not just adjustments in individual judicial districts. For example, so long as the district court has only one judge, there can be no vote dilution claim. When caseload increases and an additional judgeship is created, however, the potential for vote dilution, as defined by Section 2 and by *Thornburg v. Gingles,* increases in any district where there is a significant, cohesive minority group. The problem exists because of the election system employed—all district and family court judges run district wide, designated by division. All court of appeal judges run district or circuit wide, designated by division if there is more than one judge. A casual review of the statutes indicates that the Louisiana legislature adds one or more district or court of appeal judges at almost every session. Plaintiffs' approach of simply drawing sub-districts in certain multimember districts would require a reapportionment every time an additional judgeship were added. If the method of electing judges (when there are more than one to be elected) leads to vote dilution in some districts, then the remedy should be in the form of modifying the system so that it cannot lead to vote dilution, rather than creating subdistricts or otherwise modifying only certain judicial districts. Obviously, all judicial elections are held in districts, therefore, it is to the district elections that the court must look to determine whether the election system produces violations of Section 2. If violations are found, however, our task is to revise the system, not to tinker with the "guilty districts." Legislative election districts serve no governmental purpose except equal representation and they are easily revised. District judicial districts are, however, jurisdictional and they serve an important governmental function which has nothing to do with population.

## THE RELEVANT FACTORS

The Senate Report which accompanied the 1982 amendment to Section 2 spelled out seven factors which the report says typically may be relevant to a Section 2 claim. Of course, those factors are neither exclusive nor comprehensive. The Fifth Circuit has recently made it plain that those factors should be reviewed in vote dilution cases. See *Campos v. City of Baytown, Tex.,* 840 F.2d 1240 (5th Cir.1988) and *Citizens For A Better Gretna v. City of Gretna,* 834 F.2d 496 (5th Cir.1987). They will be considered here.

### 1. History of Official Discrimination

■ Louisiana has a long history of de jure and de facto restrictions on the right of black citizens to register, to vote, and otherwise participate in the democratic process. This court takes judicial notice of that history, as did the court in *Chisom v. Edwards,* 690 F.Supp. 1524 (E.D.La.1988) and *Martin v. Allain,* 658 F.Supp. 1183 (S.D.Ms.1987). Much of that history is set forth in *Major v. Treen,* 574 F.Supp. 325 (E.D.La.1983) (three-judge court), particularly at pages 339–341, which this court adopts by reference. Many of those factors have been included in the stipulations of the parties in this case.

■ Defendants argue that only acts of official discrimination undertaken by the state since the adoption of the Voting Rights Act should be relevant on this issue. Defendants correctly point out that since adoption of the federal law there have been few overt official acts of discrimination but the parties have stipulated that since the adoption of the Voting Rights Act, the Department of Justice has sent federal registrars and federal election observers to various parts of Louisiana. The parties have also stipulated that Louisiana has almost routinely enforced statutes relating to judicial elections without complying with the provisions of Section 5 of the Voting Rights Act. Counsel's argument is simply not completely correct. The entire history of discrimination must be considered although this court certainly acknowledges that there have been improvements made by virtue of the Voting Rights Act of 1965.

I conclude, as did the court in *Major v. Treen*, 574 F.Supp. 325 (E.D.La.1983) (three-judge court), that:

"Louisiana's history of racial discrimination, both de jure and de facto, continues to have an adverse effect on the abilities of its black residents to participate fully in the electorial process." 574 F.Supp. at 339.

### 2. Racially Polarized Voting

Another of the factors noted by the Senate Report on the 1982 Amendment is whether there exists racially polarized voting. The existence of racially polarized voting in Louisiana has been found by many courts. See, inter alia, *Citizens for a Better Gretna v. City of Gretna*, 636 F.Supp. 1113 (E.D.La.1986), aff'd, 834 F.2d 496 (5th Cir.1987); *Major v. Treen*, 574 F.Supp. 325 (E.D.La.1983) (three-judge court); *East Jefferson Coalition for Leadership and Development v. Parish of Jefferson*, 691 F.Supp. 991 (E.D.La.1988).

The expert witnesses of both sides, Dr. Richard L. Engstrom for the plaintiffs and Dr. Ronald E. Weber for the defendants, agreed that there is widespread racial polarization in voting in Louisiana, although they disagreed on its result upon vote dilution. Both of these witnesses utilized the same analytical techniques, bivariate ecological regression analysis and extreme case (homogeneous precinct) analysis to estimate the percentage of voters of each race who voted for the candidate preferred by black voters. Although their results in each election analyzed by both are extremely compatible, they reached opposition conclusions as to the existence of minority vote dilution.

Dr. Engstrom confined his study to judicial elections in which there were both black and white candidates. He examined only elections in 1978 or later years. He reviewed 31 different district court elections and one court of appeal election, as well as elections for district attorney in Orleans and the Fourth Judicial District (Morehouse and Quachita). He also examined 20 judicial elections involving city court, municipal court or juvenile judges.

Fifteen of the elections Dr. Engstrom examined were for Orleans civil or criminal district judge. Orleans was also the election district for the one court of appeal election which he examined. The other district court elections examined were: five from the Nineteenth (East Baton Rouge), three from the Fifteenth (Acadia, Lafayette and Vermillion), two each from the First (Caddo), the Ninth (Rapides), and the Eighteenth (Iberville, Pointe Coupee and West Baton Rouge), and one each from the Fourteenth (Calcasieu) and the Twenty-first (Livingston, St. Helena and Tangipahoa). The city and juvenile court elections were all from these same areas except one—a juvenile court election in the Twenty-fourth District (Jefferson Parish). Thus, Dr. Engstrom analyzed a total of 54 elections held in 9 of Louisiana's 32 district court districts which have more than one judge (there are 9 single-judge districts) and an election for district attorney in a tenth judicial district. According to Dr. Engstrom, the elections were held in areas which contained 61.5 percent of the state's population and 66.3 percent of the black population (as of the 1980 census).

The districts in which the elections were held and analyzed by Dr. Engstrom include all districts containing more than 100,000 population except three: the Sixteenth (St. Mary, Iberia and St. Martin), the Twenty-second (Washington and St. Tammany) and the Twenty-sixth (Bossier and Webster). The areas include all of Louisiana's largest cities and there are judicial elections from the northwest (First—Caddo), the northeast (Fourth—Quachita, Morehouse), central Louisiana (Ninth—Rapides), Florida parishes (Eighteenth—Iberville, West Baton Rouge and Pointe Coupee, Nineteenth—East Baton Rouge and Twenty-first—Tangipahoa, St. Helena and Livingston), southwest (Fourteenth—Calcasieu), Acadiana (Fifteenth—Acadia, Lafayette and Vermillion) and southeast (Orleans and Twenty-fourth—Jefferson).

Dr. Engstrom concluded that in 28 of the 32 elections for district court and court of appeal, including Orleans, black voters expressed a preference for black candidates

(27 by majority, one by plurality), while white voters never cast a majority or even a plurality for any black candidate. In the other 20 judicial elections which were analyzed, Dr. Engstrom estimated that black voters expressed a preference for black candidates in 19 (one by plurality and 18 by majority). Again, white voters never cast even a plurality for any black candidate.

The parties have stipulated that in 13 judicial districts and several court of appeal districts, the black population is sufficiently large and geographically compact to constitute a majority in at least one single member sub-district. The elections examined by Dr. Engstrom include seven of those districts.

Judicial elections have not recently been held in all judicial districts or in all court of appeal election districts. Accordingly, Dr. Engstrom also performed an analysis of the 1988 Democratic presidential primary [1] in which the Reverend Jesse Jackson, a black, ran first. Dr. Engstrom estimated that Jackson received 94.6 percent of the black votes statewide but only 2.3 percent of the white votes. He also estimated the vote, by race, in each judicial district in the state and in each court of appeal district. The estimated black vote for Jackson ranged from a low of 82.5 percent in the Second District (Jackson, Claiborne and Bienville) to highs of 100 percent in 15 districts. The estimate of white votes for Jackson ranged from a low of zero in several districts to a high of 13.4 percent in the Third District (Lincoln and Union). The results were about the same when analyzed by court of appeal district. The results correlate closely with the results that Dr. Engstrom estimated in the judicial elections.

Dr. Engstrom's estimates of the black and white vote percentage in the stipulated judicial districts for Jackson in the Democratic primary were:

| District | % of Black Votes | % of White Votes |
|---|---|---|
| 1st (Caddo) | 94.6 | 2.3 |
| 4th (Quachita, Morehouse) | 94.3 | 0.0 |
| 6th* (East Carroll, Madison & Tensas) | 95.2 | 6.8 |
| 9th (Rapides) | 100 | 3.8 |
| 14th (Calcasieu) | 97.9 | 2.9 |
| 15th (Acadia, Lafayette, & Vermillion) | 93.7 | 0.5 |
| 18th (Iberville, West Baton Rouge, Pointe Coupee | 97.8 | 0.0 |
| 19th (East Baton Rouge) | 97.3 | 3.6 |
| 23rd (Assumption, Ascension, St. James) | 100 | 2.3 |
| 24th (Jefferson) | 100 | 2.6 |
| 27th (St. Landry) | 97 | 0.0 |
| 40th (St. John) | 96.1 | 3.4 |
| Orleans* | 96.1 | 3.4 |

* Majority black population.

In the Twenty-first Judicial District (Tangipahoa, Livingston and St. Helena), a district which was not stipulated as having a sufficient number of blacks and geographic compactness of black voters, but which did have a white versus black judicial election on the same date as the Democratic presidential primary, Jackson got an estimated 87.9 percent of the black votes and 2.5 percent of the white votes. In the judicial election, held the same day, the black candidate's black vote was estimated at 79.4 percent and the white vote at 4.6 percent.

In 49 of the 54 elections black voters preferred a black candidate; white voters never voted even a plurality for a black candidate.[2]

Dr. Engstrom also analyzed two other elections: the statewide 1987 election for secretary of state in which the names of three black candidates were on the ballot (one of whom withdrew before election

---

1. Defendants objected to this because it was a *party* primary. Louisiana still has many more people registered as Democrats than Republicans, and it was an *election* at which people actually voted. It provides some useful information—it at least generally confirms the conclusions suggested by the other elections.

2. Defendants suggest, and offered some evidence, that in at least some of the elections, the white vote preference was based upon qualifications or other factors than purely race. The court agrees that some of the white candidates were no doubt conceived by the electorate as better qualified to hold the office of judge than the black candidate. But the fact that in 54 chances white voters never voted even a plurality for the black candidate strongly indicates racial polarization of white voters.

day) and the 1986 election in the Eighth Congressional District. This court concludes that the secretary of state election is of little value since there is no evidence that any of the black candidates mounted a serious statewide campaign or, even that most voters statewide, were aware of their race. There is no question but that all voters were aware of Jackson's race and that all voters in the congressional election were aware that Williams was a black woman. There was some "cross-over" voting for Williams at about 20 percent and her black support was almost complete in the run-off, which she narrowly lost. Since Dr. Engstrom did not present an analysis of the vote in the judicial districts or the court of appeal election districts, this election is of little value to us other than showing a general predisposition of Louisiana voters in that area to vote by race.

It was Dr. Engstrom's opinion that his analysis shows a pattern of racially polarized voting across the state which is "pronounced and persistent." The results also show that in most elections the black candidate was the preferred candidate of the black minority but that white bloc voting defeated the black candidate. There were several elections in which the black candidate was not the preferred candidate, for example, one black candidate in East Baton Rouge received only 15.8 percent of the black vote and another only 11.8 percent. In the far greater number of elections analyzed by Dr. Engstrom, however, the black voters preferred the black candidate and majority white bloc voting enabled the white candidate to win.

Defendants vigorously contest Dr. Engstrom's estimation of relative voter "participation" as between black and white voters. He attempted to estimate participation using the number of registered voters in the precinct rather than actual "turnout"—voters who actually voted in one or more elections on the ballot on election day. Dr. Engstrom's analysis obviously makes no allowance for the familiar "drop off" in voting from the "top of the ticket" (president, governor) to those considered less important by some voters (judge). Dr. Engstrom's conclusion that the percentage

of registered voters who actually vote is lower among black voters than white voters, is, therefore on somewhat shaky ground. Dr. Engstrom extropolates from this conclusion that even in districts where black voters are in the majority, they can be out voted by white bloc voting because of greater white participation. While it is certainly logical to assume that a generally less educated, less financially well off group would likely participate less in civic affairs, including voting, than a better educated, better off group (and there certainly are those disparities between blacks and whites generally in Louisiana) the numbers are certainly not conclusive. Also, the court agrees with defendants' expert, Dr. Renwick, that where there is high black interest in an election, there is likely to be high black "turnout" on election day and that the general public is less interested in judicial elections than those for governor, mayor and other offices.

■ Dr. Weber, for the defense, analyzed all judicial elections for district court, family court and court of appeal during the period 1976–1988 without regard to the race of the candidate. As noted, he used the same estimating techniques as Dr. Engstrom and he concluded that the election system does not dilute black voting strength and that black preferred candidates win a "strong majority of the elections being analyzed." Dr. Weber concluded that while there is racial polarization, black voting strength is not diluted by white bloc voting. In an election offering black voters a choice of white candidates, it is not always easy to determine whether there actually is a "black preferred candidate." This court notes, as did Judge Beer, in *East Jefferson,* supra, 691 F.Supp. at 1001, that, "The fact that blacks and whites prefer the same candidate in white only elections, but different candidates when blacks enter the race is strong evidence that racially polarized voting exists."

This court, on the evidence presented concludes that across Louisiana and in each of the family court and district court judicial districts as well as in each of the court

of appeal districts, there is consistent racial polarization in voting.

*Thornburg v. Gingles*, supra, suggests that as a precondition, plaintiffs in a vote dilution case must prove that the white majority votes sufficiently as a bloc to enable it, in the absence of special circumstances, usually to defeat the minority's preferred candidate. Dr. Engstrom has convinced this court that the white majority has done so repeatedly in Louisiana judicial elections.

### 3. Candidate Slating

There is no candidate slating process in Louisiana.

### 4. Socio-economic Factors

The stipulated facts establish the substantial socio-economic disparities which exist in Louisiana today between blacks and whites. These disparities are a vesture of past discrimination and they do hinder the ability of blacks to effectively participate in the political process. Some of those factors are median family income—$20,867 for whites, $10,459 for blacks; poverty level—blacks comprise 59.95% of all persons below poverty level in Louisiana; median years of school completed—whites 25 years of age and older 12.4, blacks 10.7; unemployment—2.6% of white persons 16 years and over, 5.7% of blacks (1980 Census figures).

### 5. Racial Campaign Appeals

Plaintiffs offered evidence of both subtle and overt racial appeals in recent judicial elections in the First Judicial District, in the Fifteenth Judicial District, in the Nineteenth Judicial District, and in Orleans, as well as in the congressional election. Such appeals still do appear in some white-black campaigns.

### 6. Extent to which Blacks have been Elected to Office

The parties have stipulated that black citizens comprise about thirty percent of Louisiana's population. Black lawyers now hold only 5 of the 178 district court judgeships and only 1 of 48 court of appeal judgeships.

The parties have stipulated that outside of Orleans Parish there are 156 district court judgeships and there are two black judges (and no more than two) who have been elected and who will be serving in district court judgeships as of June 1988. In Orleans Parish no black lawyers are currently serving as judges on the criminal district court. Israel Augustine is a black lawyer who was appointed to the criminal district court in 1969. He ran for election in 1970 and was elected as an incumbent judge, defeating two white candidates in the primary. He was unopposed in the general election. He is the only black lawyer (excluding ad hoc appointments) who has served on the Orleans Parish criminal district court in the twentieth century.

Outside of Orleans Parish four black lawyers (and no more than four) have been elected to district court judgeships in the twentieth century in Louisiana. They are: Paul Lynch, First District (Caddo Parish) in 1978, Lionel Collins, Twenty-fourth District (Jefferson Parish) in 1978, Carl Stewart, First District (Caddo) in 1985 and Freddie Pitcher, Nineteenth District (East Baton Rouge) in 1986.

In the case of Judge Collins, there were special circumstances because he was first appointed to a vacancy and then elected as an incumbent in 1978 in an election in which he had no opposition. Judge Pitcher was elected in East Baton Rouge where this litigation is pending and after this litigation commenced. While the term "aberration," used by one witness to describe Judge Pitcher's victory, is too strong, it is clear that the election must be considered as one under unusual circumstances.

In Orleans Parish three black lawyers currently serve as judges on the civil district court. They are the only black lawyers who have been elected to the Orleans Parish civil district court in the twentieth century. There are a total of 22 civil and criminal district judgeships in Orleans.

In the twentieth century, only six black judges have been elected to the district court or court of appeal in Orleans. They

are: Israel Augustine (Court of Appeal), Ernest Morial (Court of Appeal), Joan Armstrong (Court of Appeal), Revius Ortique, Jr. (Civil District Court), Bernette Johnson (Civil District Court) and Yada McGee (Civil District Court). When Judge Augustine was elected to the Court of Appeal, he was a sitting criminal district judge and he had no opposition. When Judge Morial was elected to the Court of Appeal, he was a sitting Juvenile Court judge—a position to which he had been appointed. Judge Morial was the first black lawyer to be elected to the Court of Appeal in the twentieth century and that election was in 1972. There has never been more than one black Court of Appeal judge at any one time in the twentieth century in Louisiana.

These facts and the other stipulated facts, together with the testimony presented illustrate the difficulty which blacks have encountered in attempting to be elected to judicial office in Louisiana.

They have had more success in Orleans Parish than in any other part of the state. Orleans is an election district for many offices, among them: mayor of the City of New Orleans, council-at-large, civil district judge, criminal district judge, juvenile judge, court of appeal district, civil sheriff, criminal sheriff, clerk of the criminal court. Orleans today is majority black in voter registration (53.17%). The black percentage of voters has steadily increased and it continues to increase. The Orleans Parish Trial Judges Association has shown that an impressive number of black public officials have been elected parish-wide since 1968. In some of those elections, there were special circumstances, such as some of those mentioned above, however, Orleans has elected an impressive number of black officials, including mayor, council-at-large, school board at-large, civil sheriff, and clerk criminal district court. The last three mayorial campaigns resulted in the election of black mayors. In the last mayor's election (1986), two black candidates made the

runoff, while no white candidate made the runoff. The evidence convinces this court that black candidates now have, as plaintiffs' expert, Dr. Engstrom, conceded, a good opportunity to win elections in Orleans.[3] The primary reasons for the "minority's" good chance to win in Orleans today, however, is that it is no longer a minority. The evidence still shows racial polarization in voting but not vote dilution *now*, although there was in the past. Plaintiffs argue that blacks must still be treated as a minority in Orleans in order to overcome the effects of past discrimination. I express no view on that matter except to note that a system change will resolve the issue all over the state and that out of 16 tries, the black judicial candidate won three times. Of course, as the black voting majority increases, it will become easier for black judicial candidates to win if Orleans continues to vote on account of race.

*If all of us voted without regard to race,* the problem would be solved and there could be no claim of a Section 2 violation. That day does not yet seem to have arrived—even in Orleans.

### 7. Use of Unusually Large Districts and Other Limitations

The area and population of each district court and each court of appeal circuit and district have been stipulated. Plaintiffs offered the testimony of several recent, unsuccessful, black candidates for judicial office regarding the problems they encountered in mounting district-wide campaigns. *More often than not it is more difficult for* black candidates to raise campaign funds than for white candidates. District courts range in size from the smallest, 345 square miles (40th District) to the largest, 2239 square miles (15th District). The court of appeal districts range in size from the largest, 19,344 square miles (Third Circuit, At-large), to the smallest, 350 square miles (Fourth Circuit, District 1—Orleans).

---

**3.** As this court has noted, supra, where the election system produces violations of Section 2, the remedy must be to change the process. In considering claimed Section 2 vote dilution violations involving judicial elections, the court does not focus upon "guilty" and "not guilty" judicial districts, as one does in legislative elections. If the system produces violations, then the system is to be changed.

No doubt reducing the size of election districts would make it easier for all candidates, including black candidates to mount more effective campaigns but Louisiana has a valid policy in limiting the number of family courts, district courts and courts of appeal. It would certainly not be desirable to have a district court at every major highway intersection in the state. A proliferation in the number of district courts could certainly cause administrative problems. Division of the state into five circuit courts of appeal is certainly a reasonable limitation upon the number of circuit courts, considering the many valid reasons for limiting the number of those courts, such as avoiding the potential for conflicting views among the circuits.

I conclude that the district courts are no larger than they need to be. The court of appeal districts are not jurisdictional (except circuit atparge seats) and may be changed by the Legislature. They are simply election districts and Louisiana has no strong public policy reason for maintaining their current size.

The requirement that each judicial candidate qualify for a specific post or division does limit the ability of black voters to select candidates of their choice, since it results in a "head-to-head" contest in every election.

Louisiana has in the past used anti-single shot provisions and the run-by-division requirement in judicial elections is a functional equivalent.

Louisiana has an open primary with the two top candidates going into the general election. That system does not impede participation.

The Senate Report also suggested that lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group might be a factor in some cases. That obviously is not a factor in this case since the only response which a member of the judiciary may make is to rule on all matters fairly and impartially, without favoring or being prejudiced against any group.

Thornburg v. Gingles Factors

In *Thornburg*, the Supreme Court suggests that use of multimeter election districts generally will not impede the ability of minority voters to elect representatives of their choice unless the minority is sufficiently large to constitute a majority in a single-member district, that it is politically cohesive and that while bloc voting usually defeats the minority preferred candidate. 106 S.Ct. at 2766.

The drawing of a hypothetical single member subdistrict, as instructed by *Thornburg*, is not intended to imply that such subdistricts ought to be drawn. *Thornburg* simply uses this factor as an illustration of the existence of significant vote dilution in a multimember district because, if the minority cannot constitute a majority in a single member district, the multimember form of the election district cannot be responsible for their inability to elect their preferred candidates.

The parties have stipulated that the black population in a certain number of multimember judicial districts is sufficiently large and geographically compact to constitute a majority in at least one single member subdistrict, if such subdistricts were created. Those districts are:

The Family Court for the Parish of East Baton Rouge;

District courts, 1, 4, 6, 9, 14, 15, 18, 19, 23, 24, 27, 40;

Orleans Parish Civil District Court;

Orleans Parish Criminal District Court;

Court of Appeal districts: First Circuit, district 2;

Fourth Circuit, district 1.

Defendants' expert testified that each such subdistrict would have a black voter registration majority as well.

The court finds that in all those districts, and the 21st, the white majority has voted sufficiently as a bloc to enable it, in the absence of special circumstances, usually to defeat the minority's preferred candidate. In Orleans Parish, the minority's preferred judicial candidate has been defeated in 13 of 16 tries in the last ten years.

Blacks have fared better in seeking other offices.

In addition, plaintiffs have demonstrated that majority black subdistricts can be created in the following district court and court of appeal districts: 2, 3, 7, 10, 11, 16, 20, 21, 26, 29; First Circuit—district 3; Second Circuit—districts 1, 2, and 3; Third Circuit—districts 1, 2, and 3; Fourth Circuit—at-large; Fifth Circuit—district 1. Also, using a circuitwide analysis, plaintiffs have shown that majority black single-member subdistricts could be created in all of the existing circuits of the courts of appeal.

■ The expert for the defense agreed that majority black single-member subdistricts could be created in all of those districts. With respect to most of them, Dr. Weber testified that the subdistricts would also be majority black in voter registration. In none of them has a black lawyer been elected to a district, family court or court of appeal judgeship. The parties argue back and forth as to whether some of these districts would be contiguous but there is no doubt that in each of those districts there is a substantial cohesive black minority. It is unnecessary to find a violation in each district in order to determine that Louisiana's judicial elections system has produced and will produce violations of Section 2.

If Louisiana continues to choose judges by popular election, surely it will employ uniform procedures statewide to elect district judges, to elect family court judges, and to elect court of appeal judges. Consequently, this court is convinced that all such elections must be halted while the state determines what procedures will be utilized.

CONCLUSION

■ The "totality of the circumstances" which are detailed above leads inevitably to the ultimate conclusion that the present use of multimember election districts and circuit wide election districts in judicial elections affords black citizens "less oppor-

tunity than other members of the electorate to participate in the political process and to elect representatives of their choice" in those elections.

Neither the Constitution nor the Voting Rights Act requires that black citizens have judicial seats reserved for their candidates or that they be granted judicial posts in proportion to their numbers in the general population. But, where black citizens constitute a significant minority of the population, they are politically cohesive and generally lose because of racial voting patterns, Section 2 violations arise. As plaintiffs point out, even in Orleans Parish, only three lawyers have been elected to district court judgeships in contested elections although others have been appointed and subsequently elected without opposition, such as Judge Augustine. While blacks do hold some judicial offices in Louisiana, few obtained them by way of contested elections. Almost all were first appointed and subsequently unopposed. Those who campaigned in contested elections were almost always defeated by white majority bloc votes, despite strong support from the black minority.[4]

Although minority vote dilution was not proved in each of the 41 district court districts or in all of the court of appeal districts, racial polarization in voting in all types of elections, including judicial elections, was clearly established statewide. It was also established that in those districts where the minority has fielded candidates, the majority white bloc vote has almost always defeated the minority candidate and that Louisiana's election system prevents the minority from making its voting strength effective. These facts indicate that in multimember judicial districts where the minority vote is a substantial part of the voting population and is politically cohesive, the minority has less opportunity to participate in the process. Even though no specific Section 2 violation may exist in a particular district at this time, the system employed by the state will allow the creation of a violation, given time.

---

4. The court again acknowledges that it will become easier for blacks to be elected to any office in Orleans as the black voter majority increases.

The remedy is to revise the system—to cast about for alternative procedures under which black voters would have a better chance to elect judicial candidates of their choice.

There are many alternatives which may be considered. This court has no preconceived notion as to what changes the Governor and the Legislature ought to make. This court is simply convinced that the present system of electing family court, district court, and court of appeal judges in Louisiana has produced violations of Section 2 of the Voting Rights Act and that it will continue to produce violations unless it is changed.

Accordingly, the preliminary injunction previously issued will be made permanent and will be expanded to enjoin all family court, district court, and court of appeal elections until revisions in the electorial process are made.

### ON MOTIONS TO AMEND AND FOR STAY

This matter is before the court upon: (1) a motion by plaintiffs to amend the findings of fact and conclusions of law, (2) a motion by the state defendants and intervenor, the Louisiana District Judges Association for a stay of the order of injunctive relief or in the alternative, a motion for modification of the injunction and (3) a motion by defendant-intervenor, the Orleans Trial Judges Association for a stay of the order of injunction pending appeal.

**Motion to Amend Findings of Fact and Conclusions of Law**

▇ No judgment has yet been signed in this case and accordingly the court may amend the findings and conclusions in its discretion. Rule 52(b), Fed.R.Civ.P.

Plaintiffs request clarification of the statement on page 25 of the court's findings and conclusions that, "The city and juvenile court elections were all from these same areas...." Plaintiffs assert that the statement omits a judicial election in the Fourth Judicial District which was analyzed by Dr. Engstrom. Defendants respond that they do not object to amending

the court's findings, "to include the 1984 city court election in Monroe." The referenced statement is unclear. The court intended to include the election for district attorney which was held in the Fourth Judicial District and which was also analyzed by Dr. Engstrom. In addition, Dr. Engstrom actually examined two city court elections in the Fourth Judicial—1984 elections in Bastrop (Morehouse Parish) and Monroe (Quachita Parish). The findings and conclusions are hereby amended so as to make that clear.

Plaintiffs also assert that the findings and conclusions do not clearly reflect the specific districts in which the court has found that the system utilized by the state of Louisiana in electing its family court, district court, and court of appeal judges has produced violations by Section 2 of the Voting Rights Act of 1965. Defendants request that the court also specifically list those districts in which no violation is found and complain that the court failed to specifically note that the Sixth and Twentieth Judicial Districts are presently majority black.

The findings and conclusions in this regard are somewhat unclear. Although the court did note in its chart on page 28 that the Sixth Judicial District (East Carroll, Madison and Tensas) and Orleans Parish are currently majority black in population, it did not make any specific reference to the Twentieth Judicial District (East and West Feliciana) which, according to the stipulation of the parties was 52.2% black according to the 1980 Census.

The court should have made it plain that the Sixth Judicial District, with two district judges, falls into a category similar to that of Orleans Parish. Although there is a majority black population, there is strong evidence of racial polarization in voting and white majority bloc voting can usually prevent the preferred black candidate from winning. Accordingly, it is included in the list of those districts in which the court found Section 2 violations.

The court intended to state that it found violations in every district listed on page 38 and 39. Apparently, it did not clearly do

**304**

so. In order to make it plain, the court finds that the system utilized by the state to select its judges has produced violations of Section 2 of the Voting Rights Act in the following districts:

The Family Court for the Parish of East Baton Rouge;

District Courts 1, 2, 3, 4, 6, 7, 9, 10, 11, 14, 15, 16, 18, 19, 20, 21, 23, 24, 26, 27, 29 and 40;

Orleans Parish Civil District Court;

Orleans Parish Criminal District Court;

Court of Appeal Districts: First Circuit, Districts 2 and 3;

Second Circuit, Districts 1, 2 and 3;

Third Circuit, Districts 1, 2 and 3;

Fourth Circuit at-large;

Fourth District, District 1;

Fifth Circuit, District 1;

using a circuit-wide analysis, all five of the existing circuit courts of appeal.

■ Although judicial elections were not held in all of the cited districts, there was at least one election in each judicial district. As *Thornburg v. Gingles* comments, a pattern of racial bloc voting that extends over a period of time is more probative of legally significant polarization than are the results of a single election. The court further notes, however, that:

When a minority group has never been able to sponsor a candidate, courts must rely on other factors that tend to prove unequal access to the electorial process. 106 S.Ct., n. 25 at 2770.

■ The elections which were presented to the court are sufficient to sustain the finding that there is a state-wide pattern of racially polarized voting which, according to Dr. Engstrom, is "pronounced and persistent." Some of the other factors in districts where no evidence of minority elections was presented are discussed in the findings and conclusions. These include the substantial socio-economic disparities between whites and blacks in Louisiana, the testimony of black judicial candidates as to the difficulties they encounter in raising campaign funds and otherwise mounting effective campaigns, the existence of racial appeals in campaigns, the very small number of blacks who have been elected to judicial office anywhere in Louisiana, the election of some circuit judgeships circuit-wide with one circuit (the 3rd) nearly 20,000 square miles in area and the use of the qualification by division requirement which is the functional equivalent of an anti-single shot provision.

No specific violation is found in any of the remaining district court districts.

Motions for Stay of the Injunction

■ The state defendants and both intervenors, the Louisiana District Judges Association and the Orleans Trial Judges Association, move that the injunction be stayed pending appeal in order to allow certain elections now scheduled for October 1, 1988 to occur.

The court has already authorized the printing of all ballots for these judicial elections in the event that the parties are successful in convincing the Court of Appeals to modify the injunction.

According to the information submitted by the defendants, there are five district court elections scheduled for October 1, 1988 and all involve vacancies for which there are no incumbents. Those district court elections are:

Fourth Judicial District Court (Quachita and Morehouse), a district in which the court specifically found a Section 2 violation;

Seventeenth Judicial District Court (LaFourche), a district in which no specific violation was found;

Twenty-second Judicial District Court (St. Tammany and Washington), a district in which no specific violation was found but the judgeship was created by a 1970 Act of the Legislature which the state failed to timely submit to the United States Attorney General under Section 5 of the Voting Rights Act and which has not been "precleared;"

Twenty-fourth Judicial District Court (Jefferson), a district in which a specific violation has been found; and

Twenty-sixth Judicial District Court (Bossier and Webster), a district in which a specific violation has been found.

As to court of appeal judgeships, it should be noted that the court has found a violation in each of the five circuit courts of appeal, although not in every district within circuits, as presently constituted.

Act 801 of 1987 created the following court of appeal judgeships:

Second Circuit at-large;

Third Circuit, Districts 1, 2, 3, Division "C" in each district.

This statute was eventually submitted by the state to the United States Attorney General under Section 5 of the Act but it has not been "precleared." Obviously, all of these judgeships are vacant.

Thus, under Section 5, the holding of elections for four court of appeal judgeships and one district judgeship is prohibited. The three-court judge has issued its own injunction against holding elections for judgeships created under Act 801 of 1987 and Act 23 of 1970.

In the following court of appeal elections, according to the defendants, there is no incumbent running for an existing vacancy:

Second Circuit, District 1, Division "A";

Fourth Circuit, District 1, Division "B."

If the court has correctly interpreted what the defendants are saying, only the following court of appeal elections are regularly scheduled elections where, apparently, an incumbent is running for re-election:

First Circuit, District 1, Division "A";

Third Circuit, at-large;

Fourth Circuit, District 1, Division "C."

Both the state defendants and intervenors rely heavily upon the recent opinion of the Fifth Circuit in *Chisom v. Roemer (Chisom II)*, 853 F.2d 1186 (5th Cir.1988), which modified a district court injunction against the holding of a presently scheduled election for Justice of the Supreme Court of Louisiana. All defendants argue that there is no irreparable injury which has been established by the plaintiffs.

Initially, it needs to be made plain that this case has been tried on the merits and the court has rendered a decision on the merits making specific findings of fact and conclusions of law in regard to specific violations of Section 2 of the Voting Rights Act of 1985. This is not a motion for a preliminary injunction and the preliminary injunction has been subsumed by a permanent injunction. After trial on the merits, the focus changes regarding injunctive relief. Nevertheless, any injunction is a very serious remedy. As the Fifth Circuit noted in *Posada v. Lamb County, Texas*, 716 F.2d 1066 (5th Cir.1983), a Voting Rights case:

> Permanent injunctions are never lightly given. They are hedged about with circumspection: to win one, a petitioner must show a clear threat of continuing illegality portending immediate harmful consequences irreparable in any other manner ... But cognizance of comity does not command abstinence. Encroachments on the exercise of the civil liberties secured by the Constitution are barred no less when threatened by majoritarian domination of the political organs of the state. (716 F.2d at 1070)

In *State, ex rel. Guste v. Lee*, 635 F.Supp. 1107 (E.D.La.1986), Judge McNamara pointed out that determination of the immediate harmful consequences requires an examination as to whether successful plaintiffs have any adequate remedy at law:

> In ascertaining the propriety of permanent injunctive relief, a court should consider:
>
> (1) whether Plaintiff has succeeded on the merits;
>
> (2) whether Plaintiff has an adequate remedy at law;
>
> (3) the public interest;
>
> (4) the balancing of equities.

635 F.Supp. at 1125.

Here there is no question but that plaintiffs have succeeded on the merits. Clearly, plaintiffs have no adequate remedy at law. The public interest is clearly in favor of the discontinuing of an election system which the court has found illegal and surely in a balance of equities, where the court has found encroachments on the exercise of the civil liberties specifically provided by the Voting Rights Act of 1965, the state

can have no legitimate interest in continuing with a system that causes such encroachment.

Moreover, as previously noted, all but three of the scheduled elections involve judgeships which are currently vacant. Defendants argue strongly that failure to fill these judgeships will create an increased caseload and hardship on my state court brothers. The Supreme Court of Louisiana has specific statutory authority in Article 5, Section 22(B) of the Louisiana Constitution of 1974 to fill all vacancies, either newly created or otherwise, pending election. The defendants argue that because the person appointed to fill a vacancy cannot subsequently become a candidate when the election is held, the Supreme Court may have difficulty obtaining qualified persons who are willing to serve in these vacancies. This court is fully aware that the Supreme Court also has power under Article 5, Section 5(A) of the Constitution of 1974 which provides without qualification that the court "may assign a sitting or retired judge to any court." See *State of Louisiana v. Bell*, 392 So.2d 442 (La.1981). The Supreme Court frequently uses retired judges to provide additional judicial help where needed, even when there are no vacancies and retired judges are most unlikely to become candidates. Accordingly, it is difficult for this court to see how hardship can be imposed upon the state when these vacancies can be filled temporarily until a lawful election can be held.

As to the three elections which apparently involve incumbents running for re-election, LSA–R.S. 42:2 specifically provides:

Every public officer in this state except in case of impeachment or suspension, shall continue to discharge the duties of his office until his successor is inducted into office.

The decision in *Chisom II* questions whether this provision applies to a justice of the Supreme Court of Louisiana and discusses extensively the problems that might be caused in close cases, should the capacity of the incumbent justice be questioned. This court has carefully reviewed the Fifth Circuit's opinion in *Chisom II*, but concludes that court of appeal judges must clearly be "public officers" under the state statute every bit as much as they are "representatives" under Section 2 of the Voting Rights Act. *Chisom v. Edwards*, 839 F.2d 1056, 1059–60 (5th Cir.1988) (*Chisom I*). Accordingly, this court concludes that there can be no doubt that these judges can continue in office pending the holding of a lawful election.

*Chisom II* emphasizes that federal courts, even after finding a violation of federal law, should look initially to the state to provide a remedy prior to attempting to fashion its own remedy. The record of this action will show that the undersigned judge has, throughout this case, made the same assertion. Having found violations, the court has called upon the Governor and the Legislature to fashion a remedy. Although the parties will be allowed to submit proposals, the court will not attempt to fashion any remedy until the state authorities report that they are unable or unwilling to do so. There is no indication that the state authorities will decline; on the contrary, there are indications that the Governor and the Legislature intend to take up the matter and report to the court before January 31, 1989.

The regular judicial elections are scheduled for 1990. There is ample time to fashion a revised system for selection of Louisiana judges and have it in place well before the time for those elections. *Chisom II* refers us to *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) for its teaching of federal caution in enjoining state elections. The Supreme Court there stated:

... It is enough to say now that, once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan. However, under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress,

equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid. In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles ... 84 S.Ct. at 1394.

Although this court in its findings and conclusions has carefully pointed out the difference between state judicial districts and legislative reapportionment schemes, the same reasoning applies to injunctive relief in judicial elections.

The record in this case will show that on several occasions prior to trial on the merits, this court declined to enjoin state judicial elections. The motion to enjoin the present elections was filed long before trial on the merits and was well known to all parties. The injunction came as no surprise. The main judicial elections will be in 1990. The few elections covered by the injunction here will not impose a hardship upon the state judicial system (5 of the 15 elections are also subject to the injunction of the three-judge court) and this is not the unusual case in which the court is justified in not taking appropriate action to insure that no further elections are conducted under the invalid system.

The defendants argue that this court finds *per se* violations contrary to Section 2 itself and *Thornburg v. Gingles* with its view stated in the findings and conclusions regarding the need to revise the election system, rather than tinkering with "guilty" judicial districts. The Court of Appeals might decide that judicial districts should be treated as though they were legislative districts for Section 2 purposes. This court can only repeat what it has said many times already. State district court districts are jurisdictional. They may not be redrawn, combined and manipulated in the same fashion as legislative districts. There are grave problems in attempting to create sub-districts within a district court jurisdic-

tion. Tinkering with the districts is not the answer. The system in its entirety, multimember districts, running by division, large court of appeal districts, and all the other factors discussed in the findings and conclusions contribute to the dilution of minority voter strength and, it is this court's firm conviction that it is the system that ought to be revised.

Having found that the system of electing Louisiana family court, district court, and court of appeal judges violates Section 2 of the Voting Rights Act and having issued a permanent injunction against holding elections under that system, the court would be completely inconsistent in modifying the injunction so as to permit elections under the system which has been found in violation of federal law.

Accordingly, the motions filed on behalf of all parties for a modification of the injunction are hereby DENIED.